# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 1107 | **DATE** | 1/7/2005 |
| **CASE TITLE** | Greater PA vs. Whitehall Jewellers | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. Defendants' motions to dismiss the Consolidated Complaint are granted in part and denied in part (R.20-1, 21-1). Plaintiff has until February 10, 2005 to file a Second Amended Complaint addressing the deficiencies set forth in the Court's opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JAN 10 2005 date docketed | | |
| ✓ | Docketing to mail notices. | | | 34 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| TH✓ | courtroom deputy's initials | 2005 JAN -7 PM 12:52 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREATER PENNSYLVANIA CARPENTERS PENSION FUND, On Behalf of Itself and All Others Similarly Situated, | )<br>)<br>)<br>) | |
| Plaintiff, | ) | No. 04 C 1107 |
| v. | )<br>)<br>) | |
| WHITEHALL JEWELLERS, INC., et al., | )<br>) | |
| Defendants. | ) | |

DOCKETED
JAN 10 2005

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff has commenced this purported class action against Defendants alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act, 15 U.S.C. §78t-1. Plaintiff purports to represent a class of persons who purchased Whitehall stock from November 19, 2001 to December 10, 2003. In essence, Plaintiff alleges that Defendants knowingly and recklessly reported false and misleading financial results and guidance for the fiscal quarters and full years ended 2000, 2001, 2002, and the first two quarters of 2003, and that Whitehall's former Chief Financial Officer helped cover up the alleged fraud. Defendants have moved to dismiss this securities fraud amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). As discussed in detail below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

### I. The Parties

Lead Plaintiff Pennsylvania Fund brings this suit on behalf of all persons who acquired the common stock of Whitehall Jewellers, Inc.("Whitehall") between November 19, 2001, and December 10, 2003 (the "Class Period.") (R. 14-1, Cons. Comp. ¶ 1.) The Pennsylvania Fund purchased Whitehall stock during the class period. Its last purchase of Whitehall stock took place on June 6, 2002. The Pennsylvania Fund sold all of its Whitehall holdings by the end of July 2002.

Whitehall is a Delaware corporation, with its principal offices located in Chicago, Illinois. It is a specialty retailer of fine jewelry operating through 384 mall-based stores in 38 states under the following brand names: Whitehall Co. Jewellers, Lundstrom Jewelers, and Marks Brothers. It trades on the New York Stock Exchange ("NYSE") under the ticker symbol "JWL." (*Id.* ¶ 15.)

Defendant Hugh Patinkin serves as Chairman of the Board, Chief Executive Officer ("CEO"), and President of Whitehall. (*Id.* ¶ 16.) Defndant John H. Browne served as Whitehall's Chief Financial Officer ("CFO"), Treasurer, and Executive Vice President until Whitehall fired him on approximately December 11, 2003. (*Id.* ¶ 17.) Defendant Matthew Patinkin is Whitehall's President of Operations. (*Id.* ¶ 18.) Defendant John Desjardins is Whitehall's interim CFO and Executive Vice President of Operations. Desjardins previously served as Whitehall's Executive Vice President of Finance and Administration. (*Id.* ¶ 19.) Defendant Manny Brown was Whitehall's Executive Vice President of Operations during the Class Period, and had responsibility for the Company's daily operations. (*Id.* ¶ 20.)

## II. The Alleged Fraudulent Schemes

Plaintiff alleges that Defendants engaged in various schemes and fraudulent transactions to inflate Whitehall's inventory balances, net income and earnings per share, which artificially inflated the price of Whitehall's stock.

### A. The Inventory Scheme

Plaintiff alleges that Defendants engaged in a reciprocal inventory scheme with Whitehall's vendors to inflate Whitehall's financial results. It contends that Defendants deliberately concealed the scheme from investors. Under the alleged scheme, Whitehall purchased merchandise inventory from its vendors, usually on credit and recognized the value of the inventory on its books. (*Id.* ¶ 27.) After the inventory depreciated in value, Plaintiff alleges that Whitehall improperly failed to write-down the value of the depreciated inventory to reflect its fair market value. Instead, Whitehall negotiated side agreements, outside its normal policies and contractual obligations. This allowed Whitehall to return the inventory to the vendor in exchange for excessive discounts, incentives, "vendor allowances" or "barter credits" which reimbursed Whitehall for the full average cost of the merchandise purchased from the vendor, even though the fair market value of the inventory had depreciated well below its average cost. (*Id.*) In exchange for these discounts, vendor allowances and credits, Whitehall issued additional purchase orders for new merchandise inventory from the vendor. This, in turn, enabled vendors to inflate their revenues and receivables. (*Id.*)

Plaintiff alleges that this inventory scheme enabled Whitehall to falsify its inventory values, net income and earnings per share in violation of Generally Accepted Accounting Principles ("GAAP") by circumventing the required impairment charges on its depreciated

3

inventory. (*Id.* ¶ 28.) If Defendants had properly accounted for the substandard inventory under GAAP, they would have incurred an expense by establishing a reserve. (*Id.*)

### B. The Cosmopolitan Scheme

Plaintiff also alleges that Defendants engaged in a vendor scheme with Cosmopolitan Gem Corporation ("Cosmopolitan"), one of Whitehall's vendors. (*Id.* ¶¶ 6, 33-54.) Plaintiff alleges that Browne knowingly participated in this scheme and received bribes in return for his involvement. (*Id.* ¶ 6.)

According to the Complaint, Capital Factors purchased a security interest in Cosmopolitan's accounts receivable and inventory. Cosmopolitan used that money to finance its operations and pay off debt. (*Id.* ¶ 34.) Cosmopolitan and Whitehall engaged in a scheme to conceal Cosmopolitan's strained financial condition. Under their arrangement, Plaintiff alleges that Whitehall and Cosmopolitan concealed from Capital Factors excessive discounts, incentives, allowances and credits granted to Whitehall by Cosmopolitan which Cosmopolitan should have deducted from the value of its receivables. (*Id.* ¶ 36.) Whitehall knowingly permitted Cosmopolitan to create fictitious accounts of Whitehall's payables and to improperly apply payments to Cosmopolitan's oldest receivables. (*Id.*) Plaintiff alleges that this scheme "improved the appearance of Cosmopolitan's aging receivables, overstated Cosmopolitan's accounts receivable (and Whitehall's accounts payable) and understated Cosmopolitan's financial commitments and obligations to customers." (*Id.*) Plaintiff further alleges that Whitehall knowingly participated in the scheme with Cosmopolitan because Whitehall received a continuous stream of excessive undisclosed discounts, credits and vendor allowances from Cosmopolitan which inflated the value of Whitehall's inventory, net income and earnings per

4

share. (*Id.* ¶ 37.) Plaintiff alleges that Defendants knew, yet failed to disclose, that Whitehall was involved in improper reciprocal vendor schemes because of the benefit Whitehall received.

## III. The Alleged Misstatements and Omissions

Plaintiff alleges that Defendants made numerous false and fraudulent statements regarding its financial condition from the third quarter of 2001 through the second quarter 2003. These statements include press releases, SEC forms such as 10-Qs and 10-Ks, statements made to securities analysts, and financial statements. Plaintiff alleges that these statements reported false inventory balances, net income and earnings per share. It further contends that the financial statements falsely represented that they complied with GAAP. None of these statements disclosed the fraudulent inventory schemes in which Defendants had engaged or the Cosmopolitan scheme. The statements, according to Plaintiff, did not accurately represent inventory levels, vendor allowances, discounts, credits, and vendor advertising and promotion credits.

## IV. The Restatements

Plaintiff alleges that Whitehall ultimately issued two restatements of its financial results – one in March 2003 and one in December 2003. According to Plaintiff, Whitehall's auditors required the company to issue these restatements because Whitehall's previously released financial results were materially false and misleading.

### A. March 2003 Restatement

On March 5, 2003, Whitehall issued a restatement of its financial results for the first three quarters of 2002. (*Id.* ¶¶ 55, 167.) The restatement increased Whitehall's net loss per share for the first, second and third quarters of 2002 by .02 cents per share. (*Id.* ¶ 55.) Plaintiff alleges

that Whitehall admitted that the restatement was due to improper accounting of vendor allowances and discounts and incentives granted to Whitehall during those quarters. (*Id.*) Plaintiff further alleges that the March 2003 restatement was itself false and misleading because Whitehall did not disclose the accurate impact of the improper accounting on its financials. (*Id.* ¶ 57.) As a result, Whitehall had to issue another restatement in December 2003.

### B. December 2003 Restatement

On December 22, 2003, Whitehall issued its second restatement of its financial results. (*Id.* 56, 57.) In this restatement, Whitehall restated its financials for the first three quarters of 2002. Plaintiff alleges that the restatement resulted from the "same fraudulent vendor inventory manipulation and accounting improprieties that caused the March 2003 restatement (*i.e.*, improperly accounting for vendor allowances, discounts and credits which largely/primarily overstated inventory, net income and EPS)." (*Id.* ¶ 57.)

## V. The Termination of Defendant J. Browne

On December 11, 2003, Whitehall issued a press release and Form 8-K announcing that it had fired Defendant Browne, its former CFO. (*Id.* ¶ 208.) Browne, according to Plaintiff, was intimately involved in the Cosmopolitan scheme, and had accepted bribes as part of the scheme. Whitehall fired Browne as a result of its internal investigation and investigations by the Securities and Exchange Commission and the Department of Justice. (*Id.*)

## VI. Procedural Background

On April 14, 2004, the Court granted Plaintiff Greater Pennsylvania Carpenter's Pension Fund's (the "Pennsylvania Fund") unopposed motion for appointment as lead plaintiff in this case pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-

4(a)(3). (R. 9-1.) On June 14, 2004, Plaintiff filed a consolidated amended complaint in this action. Defendants Whitehall Jewellers, Hugh Patinkin, Manny Brown, Matthew Patinkin and John Desjardines thereafter jointly moved to dismiss the Complaint. Defendant John Browne filed a separate motion to dismiss, joining the other Defendants' motion.

## ANALYSIS

### I. Legal Standard

A Rule 12(b)(6) motion "test[s] the sufficiency of the complaint." *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court views "the complaint in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from those allegations in his or her favor." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003). "A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cole v. U.S. Capital*, 389 F.3d 719, 724 (7th Cir. 2004) (quotations and citations omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.*, quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Rule 9(b) requires that a plaintiff plead "the circumstances constituting fraud ... with particularity." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996). As the Seventh Circuit has explained, "this means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). These mandates require "the plaintiff to conduct a precomplaint investigation in sufficient depth

7

to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In addition to Rule 9(b), the strict pleading mandates of the PSLRA apply to Plaintiff's complaint. "The PSLRA creates rules that judges must enforce at the outset of the litigation." *Asher v. Baxter Intern. Inc.*, 377 F.3d 727, 728 (7th Cir. 2004). In order to meet the PSLRA's dictates for a securities fraud claim, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the state or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## II. Plaintiff Has Pled Loss Causation

"To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). "[T]he requirement is straightforward: The plaintiff must allege that it was in fact injured by the misstatement or omission of which it complains." *Id.* at 649. The loss causation requirement, however, does not require "that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant." *Id.*

Defendants argue that Plaintiff has failed to plead that the allegedly withheld information caused Whitehall's stock price to fall because the price did not fall following either of the restatement disclosures. But as Plaintiff points out, Plaintiff has pled that Defendants partially

8

disclosed some adverse information pertaining to the alleged fraud which caused Whitehall's price to decline prior to the March or the December restatements. For example, Plaintiff alleges that "Whitehall's stock price lost more than 50% of its value during 2Q02 after defendants disclosed their insider sales and lower guidance." (R. 14-1, Cons. Comp. ¶ 59.) On June 13, 2002, Plaintiff alleges that Whitehall issued a press release announcing some of defendants' insider sales. (*Id.* ¶ 86.) During the week of July 8-12, 2002, a majority of the Individual Defendants filed SEC Form 4s related to some of their previous insider sales, and Whitehall's stock price declined. (*Id.* ¶ 87.) Further, Plaintiff alleges that on "July 16, 2002, Whitehall issued a press release announcing lower than expected financial results for 2Q02. The stock price dropped over 17% on July 16, 2002 and another 20% the following week." (*Id.* ¶ 89.) Prior to the December restatement, Defendants issued other partial disclosures of prior misrepresentations and omissions which resulted in a decline in Whitehall's stock price, including a partial disclosure of the Capital lawsuit, and the SEC and DOJ investigations. *See id.* ¶¶ 152-160. Viewing the complaint in the light most favorable to Plaintiff, the Court can reasonably draw the inference that the loss was caused by the alleged fraud at issue. *See Danis v. USN Communications*, 73 F.Supp.2d 923, 943 (N.D. Ill. 1999)(loss causation pled where plaintiffs pled that "the market responded to and 'corrected' the price of USN stock over the better part of a year as bits and pieces of negative information became available and it became apparent that USN was not capable of performing as originally represented."); *Retsky Family Ltd. P'Ship v. Price Waterhouse LLP*, NO. 97 C 7694, 1998 WL 774678, \*\*14-15 (N.D. Ill. Oct. 21, 1998). As noted by the Seventh Circuit, loss causation "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark*, 113 F. at 649.

9

## III. False or Misleading Statements

In order to state a claim for securities fraud under Section 10(b) and Rule 10b-5, Plaintiff must allege that Defendants (1) made a false statement or omission; (2) of a material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which Plaintiff justifiably relied; and (6) the reliance proximately caused Plaintiff's damages. *In re HealthCare Compare Corp.*, 75 F.3d 276, 280 (7th Cir. 1996). These allegations must comply with both Federal Rule of Civil Procedure 9(b) and the PSLRA.

### A. The March 2003 Restatement and GAAP Violations

Defendants argue that Plaintiff has failed to state a securities fraud claim based on the March 2003 restatement because Plaintiff has failed to plead with particularity any GAAP principles that Defendants violated. The Court disagrees.

A company's overstatement of revenues in violation of GAAP principles can constitute a false or misleading statement under Section 10(b). *See Sutton v. Bernard*, No. 00 C 6676, 2001 WL 897593, at *4 (N.D. Ill. Aug. 9, 2001); *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *10 (N.D. Ill. Nov. 4, 1998); *Clark v. TRO Learning, Inc.*, No. 97 C 8683, 1998 WL 292382, at *2 (N.D. Ill. May 20, 1998). Plaintiff alleges that Defendants engaged in accounting improprieties during the class period that violate GAAP, (R. 14-1, Cons. Comp. ¶¶ 165-66), and that these accounting errors resulted in Whitehall restating its financials in March 2003 and December 2003 in order to comply with GAAP. (*Id.* ¶ 167.) Plaintiff alleges that the March 2003 restatement resulted from Defendants "improper accounting of vendor allowances, discounts and incentives granted to Whitehall during those quarters, the very same violations that continued to occur throughout the Class Period." (*Id.* ¶ 55.) Plaintiff alleges that

10

the improper accounting practices and GAAP violations included improper accounting for vendor allowances where, as admitted in the March 2003 restatement, "Whitehall had been recognizing in the wrong periods certain allowances and discounts pertaining to the Company's annual vendor agreements as well as vendor incentives associated with the purchase of consigned inventory on hand during the fiscal year that should have been included in the weighted average cost of merchandise inventory." (*Id.* ¶ 179.) Plaintiff has alleged the details of the underlying vendor allowance scheme. As a result of this failure to properly record vendor allowances, Plaintiff alleges that "Whitehall understated its expenses, overstated its income and overstated its inventory during the Class Period." (*Id.* ¶ 180.) Plaintiff has provided particular details regarding why these alleged improprieties violated GAAP. These allegations sufficiently state a claim. While it is true that Plaintiff's allegations regarding the GAAP violations in connection with the December 2003 restatement include more detail than those associated with the March 2003 restatement, Plaintiff has still met its burden as to the March 2003 restatement.

### B. The Cosmopolitan/Capital Transactions

Defendants next argue that Plaintiff has failed to state a claim regarding the Cosmopolitan/Capital transactions because it has not particularized any misstatements or omissions arising from these transactions. Plaintiff alleges that Whitehall entered into a vendor inventory scheme with Cosmopolitan whereby Whitehall and Cosmopolitan defrauded Capital Factors out of millions of dollars. (*Id.* ¶¶ 6, 33-54.) Capital, Plaintiff alleges, had purchased a security interest in Cosmopolitan's accounts receivable and inventory. (*Id.* ¶ 34.) After Cosmopolitan began facing significant financial problems, Cosmopolitan and its customers, including Whitehall, implemented a scheme to conceal Cosmopolitan's true financial condition

11

from Capital to ensure that Capital continued to advance funds to Cosmopolitan. (*Id.* ¶ 35.) Whitehall granted Cosmopolitan excessive discounts, incentives, allowances and credits which Cosmopolitan should have deducted, but did not, from its receivables. (*Id.* ¶¶ 36, 38.) Whitehall allowed Cosmopolitan to create fictitious accounts payable and to improperly apply payments to Cosmopolitan's oldest receivables. (*Id.* ¶ 36.) Plaintiff alleges that Whitehall was aware of the scheme and participated in the scheme to defraud Capital "in return for excessive discounts and credits it received from Cosmopolitan, and based on the longstanding relationship between principals of the two companies ...." (*Id.* ¶ 45.) Plaintiff alleges that Whitehall benefitted from the Cosmopolitan scheme "by receiving a continuous stream of excessive undisclosed discounts, credits and vendor allowances from Cosmopolitan which inflated the value of Whitehall's inventory, net income and EPS." (*Id.* ¶ 37.) It alleges that the scheme "allowed Whitehall to obtain excessive incentives and allowances which inflated its own books." (*Id.* ¶ 6.) Plaintiff further alleges that Defendants did not disclose the Cosmopolitan scheme to Whitehall investors during the Class Period. (*Id.* ¶ 52.) As a result of this alleged concealment and deception, Plaintiff contends that Whitehall's financials and stock price were fraudulently inflated. (*Id.* ¶ 55.) It alleges that this undisclosed scheme rendered Whitehall's financial statements during the Class Period false and misleading. Plaintiff has stated a Section 10(b) claim based on the alleged Cosmopolitan scheme.[1]

## IV. Named Plaintiff

Plaintiff has certified that its last purchase of Whitehall stock took place on June 6, 2002,

---

[1] The Court need not address Plaintiff's other arguments on the Cosmopolitan allegations given that the Court finds it has stated a claim.

and it sold all of its Whitehall holdings by the end of July 2002. Defendants argue that Plaintiff therefore does not have standing to represent a class for alleged false statements and omissions that Defendants allegedly made *after* the date of Plaintiff's last purchase, namely a class that purchased from June 13, 2002 through December 2003.

In *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411 (7th Cir. 1992), the Seventh Circuit held that the false statements allegedly made by the defendants after the named plaintiff in the class action complaint purchased the defendant company's stock could not "form the basis for Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased." *Id.* at 1420. Because the price of the plaintiff's stock could not have been impacted by statements made after the plaintiff had purchased it, the court did not allow such claims to proceed. The Seventh Circuit noted "[w]e presume only that the market is efficient, not clairvoyant," and affirmed the district court's dismissal of the claim regarding the defendant's post-purchase statements. *Id. See also Ong ex rel. Ong IRA*, No. 03 C 4142, 2004 WL 2534615, at *23 (N.D. Ill. Sept. 27, 2004) (dismissing claims based on post-purchase statements because "price at which Plaintiffs purchased their debt securities on June 21, 2002 could not have been affected by statements made after that date"); *Heartland Fin. USA, Inc. v. Financial Insts. Capital Appreciation Partners, I, L.P.*, No. 02 C 3982, 2002 WL 31819008, at *7 (N.D. Ill. Dec. 12, 2002) (alleged omissions "occurred long after Plaintiff's investment" thus dismissing claim); *Anderson v. Abbott Labs.*, 140 F.Supp.2d 894, 908 (N.D. Ill. 2001)("Statements made after named plaintiffs purchased their stock cannot form the basis for § 10(b) liability"); *In re Discovery Zone Sec. Litig.*, 943 F.Supp. 924, 944 (N.D. Ill. 1996) ("In the case before this Court, plaintiff Bernard Weisburgh was the last named class member to buy DZ

13

stock. This transaction was completed on January 17, 1995; therefore, Weisburgh's reliance on defendants' statements and their attendant impact on market price ended on this date."). The Court is bound by the Seventh Circuit's decision in *Roots*.

Plaintiff states that the Seventh Circuit decided *Roots* before the PSLRA, yet it does not explain the significance of this timing or cite any cases supporting any such significance. The Court notes that numerous cases exist that distinguish a lead plaintiff under the PSLRA from a named plaintiff for standing purposes. *See e.g., Hevesi v. Citigroup*, 366 F.3d 70, 82 (2nd Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available case of action. Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F.Supp.2d 189, 204 (S.D.N.Y. 2003) ("nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case"); *In re: Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) ("being a Lead Plaintiff under the PSLRA is not the same as being a Class Representative under Rule 23"); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 378 (S.D.N.Y. 2000) ("The Court believes on reflection that it probably has the power to designate a Class Representative under Rule 23 who is not a Lead Plaintff, simply because there is nothing in the statute which prevents it").

Further, some courts have provided that the lead plaintiff may proceed even though it does not have standing as long as a named class representative has standing to proceed on the

14

claims at issue. *See In re Salomon Analyst Level 3 Litig.*, No. 02 C 6919, 2004 WL 2757397 at *14 (S.D.N.Y. Dec. 2, 2004) ("While plaintiffs are correct that lead plaintiffs, appointed pursuant to the PSLRA, need not satisfy all elements of standing with respect to the entire lawsuit, the selection of lead plaintiffs does not remove the basic requirement that at least one named plaintiff must have standing to pursue each claim alleged"); *In re Global Crossing*, 313 F.Supp.2d at 204 ("Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims. By naming additional plaintiffs who, as purchasers of different categories of securities, have standing to bring claims on behalf of the various potential subclasses of securities purchasers, the Lead Plaintiffs in this case have simply exercised that responsibility."). *But see Gaines v. Guidant Corp.*, 2004 WL 2538374, at *18 (S.D. Ind. Nov. 8, 2004) (requiring lead plaintiff to establish their standing to bring claims).

The Seventh Circuit has not addressed this issue and the Court need not do so today since the parties have failed to address it or propose any named class members who may have standing. It is clear under *Roots* that the Pennsylvania Fund does not have standing to pursue Section 10(b) claims for allegedly fraudulent statements made by Defendants after June 6, 2002. Accordingly, these claims are dismissed without prejudice and the Court will give Plaintiff leave to replead to address this deficiency. Whether the Pennsylvania Fund decides to remain lead plaintiff or seek to add named plaintiffs who have standing to sue for statements made after June 6, 2002, is up to Plaintiff. The Court will address the legality of whatever course Plaintiff selects to cure this standing defect if and when appropriate.

15

## V. Control Person Liability

In order to state a claim for 20(a) control person liability, Plaintiff must allege: (1) a primary securities violation; (2) that the Individual Defendants exercised general control over the operations of Whitehall; and (3) that the Individual Defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Defendants only argument regarding Plaintiff's Section 20(a) claim is that Plaintiff has failed to state a primary securities violation, thus it's Section 20(a) claim must necessarily fail. Because Plaintiff has stated a claim as set forth above, this argument fails.

## **CONCLUSION**

For these reasons, the Court grants in part and denies in part Defendant's motion to dismiss the Consolidated Amended Complaint. Plaintiff has until February 10, 2005 to file a Second Amended Complaint addressing the standing deficiency set forth in this opinion.

Date: January 7, 2005

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge